657 So.2d 1087 (1995)
Robert RICHARD and Tonya Richard
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY and Cajun Contractors, Inc.
No. 94 CA 2112.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*1089 John T. Bennett, Marksville, for plaintiffs-appellants.
John Swanner, Baton Rouge, for defendants-appellees.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
SHORTESS, Judge.
This suit arises out of an accident which occurred when Robert Richard (Richard) was working as a laborer for Turner Industries (Turner) at a construction site in St. Gabriel, Louisiana. At the time of the accident, employees of Cajun Contractors, Inc., were attempting to pump water out of sump holes in a concrete slab adjacent to the construction site. The concrete slab was surrounded by a two-foot high retaining wall. Because of heavy rain the previous day, the concrete slab was covered with approximately eight inches to one foot of water. Richard was instructed by his supervisor to retrieve a ladder, which had been left on the other side of the slab. He proceeded across the muddy, water-covered slab, leaned over the retaining wall, and retrieved the ladder. Upon his return, he stepped in an uncovered, unmarked sump hole and injured his knee. He also experienced severe complications related to treatment of the knee. Richard and his wife, Tonya Richard, (plaintiffs) sued Cajun Contractors, Inc., and its insurer, St. Paul Fire and Marine Insurance Company (defendants) for negligence.[1]
A jury found defendants 80% at fault and Richard 20% contributorily liable for his own injury and awarded damages as follows:

A. General damages, past and future
 pain and suffering, permanent
 injuries and disfigurement...........$125,000.00
B. Past medical bills...................$ 72,850.00
C. Future medical bills.................$200,000.00
D. Past wage loss.......................$ 28,000.00
E. Future loss of earnings and/or
 earning capacity...................$325,000.00
 TOTAL................................$750,850.00

The jury found Tonya Richard sustained no loss of consortium, and her demand was dismissed. Plaintiffs appealed.

A. The Batson Claim
Initially, we address plaintiffs' contention that the trial court erred in allowing defendants to use six peremptory challenges on blacks and that the explanation given by defendants was not sufficient to meet the guideline test set forth in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).[2]
The record reflects that after three blacks were excused, plaintiffs objected that they had been improperly excluded. The trial court found a prima facie case of exclusion by reason of race had been made. Defense counsel offered the following explanations:
1. Stephanie R. Hammond: excluded because she was on probation for disturbing the peace and was unemployed at the time of the trial.
2. Lawrence L. Bosley: excluded because he had a medical malpractice case pending on behalf of his son at the time of trial, and defense counsel believed he might be sympathetic to an injured person.
3. Linda D. Beloney: excluded after she was observed turning around and looking at another juror who was giving a lengthy explanation of why she did not think an "extra large" award should be given. She appeared to disagree with what the other juror was saying. She also was unemployed.
After hearing the explanations, the court found the explanations were satisfactory, and the challenges were allowed to stand.
Defendants used their next three peremptory challenges against blacks, and plaintiffs' *1090 counsel objected again. After a second hearing, the following explanations were offered for exclusion of the jurors:
4. Annette Butler: excluded because her husband was employed by HCI Harmony, Inc., the company which employed Richard at the time of the accident, and also because she was a receptionist with a home health center.[3]
5. Otis Royal: excluded because his wife worked for a plaintiff law firm in Plaquemine, Louisiana.
6. Tammy Green: excluded because she was a private duty nurse with a home health care agency, and counsel thought she might be overly sympathetic to an injured person.
The court at that time did not specifically find that plaintiffs made a prima facie showing; however, defendants offered race-neutral explanations. The court accepted the excuses as valid. The jury was sworn and seated, and then two alternates were selected. Plaintiffs' counsel at this time re-urged the Batson objection. The court minutes indicate the court thereafter replaced juror Anna Andrews Brown with alternate Brian Thomas, but the transcript does not indicate why. The case then proceeded.
The Supreme Court of the United States has held that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of race and to do so is a violation of the Equal Protection Clause. Edmonson, 500 U.S. 614, 616-33, 111 S.Ct. 2077, 2081-89, 114 L.Ed.2d 660 (1991). Courts evaluate an objection to the use of peremptory challenges under a three-step analysis set forth in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
First, a defendant must make a prima facie showing that a litigant exercised a peremptory challenge on the basis of race. The preliminary issue of whether plaintiffs made a prima facie showing of discrimination is not at issue in this case.[4]
The burden then shifts to the challenged litigant to articulate a race-neutral explanation for striking the jurors in question which is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at 1724. The Supreme Court recently stated that the second step of this process does not demand an explanation that is persuasive, or even plausible. A legitimate explanation is not one which must make sense; it is one which does not deny equal protection. Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The explanations offered by defendants were race-neutral and were related to this particular case.
In the final step in the analysis, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations. It is at this stage that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Elem ___ U.S. at ___, 115 S.Ct. at 1771.
After the first objection, the court found the defendants' explanations were valid. After the second objection, the court again found defendants' explanations were valid. Plaintiffs re-urged the Batson objection after the alternates were chosen. Although the trial court did not make explicit factual findings or elucidate its analysis, it is implicit in the fact that the jury was sworn and the case *1091 allowed to proceed that the court denied plaintiffs' Batson objection.
The trial court did not err in denying plaintiffs' objection to defendants' use of all six peremptory challenges on blacks. The reasons offered by defendants were valid and related to the case. In reviewing the transcript of the entire selection process, we see no indication that the reasons offered by defendants were pretextual, implausible, unreasonable, or unrelated to the case. Furthermore, although neither plaintiffs nor defendants provided this court with the complete racial composition of the jury, the transcript does show the composition of the first venire. Three of the members of the first venire who were blacks ultimately were seated on the jury. (The first panel consisted of six blacks and six whites. At least three blacks were in the jury box from the beginning to the end of the case.)
The trial court did not err in denying plaintiffs' Batson objection, as plaintiffs did not carry the ultimate burden of proving purposeful discrimination.

B. Contributory Negligence
The jury found Richard was 20% contributorily negligent, which plaintiffs contend was clearly erroneous. In determining apportionment of fault, the court should consider the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). The apportionment of fault is a factual finding which will not be disturbed on appeal unless it is clearly wrong. Cornish v. State, 93-0194, pp. 13-14 (La.App. 1st Cir. 12/1/94), 647 So.2d 1170, writs den., 95-0547, 95-0574 (La. 5/5/95), 654 So.2d 324.
In this case, Richard followed the orders of his supervisor to retrieve the ladder. The entire construction site was wet and muddy. Although he could have walked around the retaining wall rather than crossing over it, to do so would have required him to walk the length of two football fields. All of his co-workers who testified, including his foreman, stated that the route he chose was the most direct path to the ladder. Richard's co-workers watched him go across the slab to retrieve the ladder and bring it back without objection or concern. In light of the fact that the alternative route was wet, muddy, and a significantly longer distance, choosing to walk across the concrete slab to retrieve the ladder was not negligence. We find no evidence in the record to support the apportionment of 20% fault to plaintiff. Thus, the jury was clearly wrong in its apportionment of fault, and we must amend the judgment accordingly.[5]

C. Jury Instructions
Plaintiffs also contend the trial judge erred in not instructing the jury regarding defendants' violation of certain national safety regulations.
The trial court is obligated, following the trial of the case and presentation of all evidence, to instruct the jurors on the law applicable to the cause submitted to them. La.C.C.P. art. 1792. The parties may request specific jury charges. La.C.C.P. art. 1793. The court need only give those jury instructions which fairly and reasonably point up issues, and which provide correct principles of law for the jury to apply to those issues. Stovall v. Shell Oil Co., 577 So.2d 732 (La.App. 1st Cir.1991), writ den., 582 So.2d 1309 (La.1991). The trial court has discretion in selecting jury instructions and the language use in those selected. The court's decision will not be overturned absent abuse of that discretion. Rhodes v. Winn Dixie Louisiana, 93-1848 (La.App. 1st Cir. 6/24/94), 638 So.2d 1168, 1173. Plaintiffs requested that the trial court read to the jury Occupational Safety and Health Administration standard 1926.500 and American National Standards Institute standards 3.5, 3.6, and 3.7. The trial court stated for the record:
In the case of the plaintiff's (sic) special jury instruction number six the Court has refused to give this instruction because it speaks of floors, which implies a walking surface in a building and we have no evidence from any expert to interpret the standards otherwise. We also don't have *1092 the definition of floors if there is one under the OSHA provisions. Numberplaintiff's (sic) special jury instruction number seven refers to standards of the American National Standards Institute and this oneas I understand it this is not a governmental agency. These rules have not been promulgated officially and therefore are not a part of the law and we had no expert to testify that these standards are the expected standards in the industry.
We do not find the trial court committed legal error in refusing to submit the OSHA regulation and ANSI standards to the jury when plaintiffs offered no explanation of them. While we recognize that states have incorporated ANSI standards into the law, they essentially are non-governmental standards, and plaintiffs offered no proof that the law of this state has incorporated those standards. Therefore, this assignment of error has no merit.

D. General Damages
Richard suffered a severe injury to his knee and then suffered unusually severe complications. He initially had arthroscopic surgery, then had a second "incision and drainage" surgery to deal with complications. He subsequently underwent a third incision procedure because his knee was filling up with blood. He was hospitalized for nineteen days in connection with these procedures. He was later required to spend ten days in a rehabilitation center in Baton Rouge and also has experienced other less debilitating complications since his surgeries. Richard's orthopedic surgeon, Dr. William A. Smith, stated Richard's case was "the most difficult case and most complicated case I've had following arthroscopic surgery in over seventeen hundred cases." All of the doctors and rehabilitation specialists who testified agreed Richard would no longer be capable of manual labor. Furthermore, he cannot bend, squat, crawl, stoop, lift anything greater than twenty-five pounds, climb stairs, or do repetitive or overhead work, and he will have to change positions every ten to fifteen minutes. The jury awarded $125,000.00 in general damages. Plaintiffs complain that this amount is too low.
The correct standard for appellate review of a damage award is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The trier of fact has great discretion, and an appellate court should rarely disturb an award for general damages. The supreme court in Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. den., ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), stated:
It is only when the award is in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular injury to a particular plaintiff under particular circumstances that the appellate court should increase or reduce the award.
We cannot say that $125,000.00 was lower than a reasonable person could have awarded in this case. While some might consider it low in light of the significant complications Richard suffered, it is not shockingly low. Reasonable minds differ on the compensation which should be awarded for an injury. We cannot say the decision to award $125,000.00 was one which reasonable minds could not have reached. Therefore, we will not disturb the general damage award.

E. Future Medical Damages
Defendants, in their answer to plaintiffs' appeal, complain the award of $200,000.00 for future medical expenses was too high. Defendants contend that plaintiffs did not carry their burden of proving Richard will need knee replacement surgery or incur any significant medical expenses in the future.
Dr. Lovell J. Mayeux, a board-certified family physician who initially evaluated Richard and who continued to participate in his care, testified that Richard "may" need to have future surgery on his knee because of post-operative degenerative changes and that Richard may still have fragments in his knee which require removal. Mayeux testified he expected to continue to treat Richard and that Richard had not reached maximum medical improvement or even a plateau. In the very near future, he anticipated further diagnostic testing, the possibility of neurological or orthopedic intervention on Richard's lower *1093 back, and further rehabilitation of the knee and possibly the back. He agreed that knee replacement surgery was not imminent at this time,
[b]ut with time and the loose fragments, post-arthritic changes, possibly a partial fused knee with lack of range of motion, he may be looking at total knee replacement somewhere in the future. And given his age, knee replacementsI hate to say we guarantee our work in medicine, but most orthopedic surgeons will tell someone ten to twelve year life expectancy of a knee replacement. So at his early age, he may actually be looking at a re-do replacement of the knee.
Dr. Smith stated that in his opinion Richard had reached maximum recovery, and he did not anticipate further surgery in the near future. He agreed that Richard may need total knee replacement in the future, but, if so, not for approximately twenty-five years. He also stated Richard had experienced "unusual" complications which occur in approximately 2% of people who have arthroscopic surgery; and that Richard has developed a few more complications, specifically calcification of the joint lining the synovial membrane and "keloid" formation.
In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Stiles v. K Mart, 597 So.2d 1012, 1013 (La.1992). An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out the probable cost. Holliday v. United Services Auto. Ass'n, 569 So.2d 143, 146 (La.App. 1st Cir.1990). Nevertheless, when the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. Stiles, 597 So.2d at 1013; Brumfield v. Guilmino, No. 93-0366 (La.App. 1st Cir. 3/11/94), 633 So.2d 903, 908, writ denied, 94-0806 (La. 5/6/94), 637 So.2d 1056.
The record herein clearly establishes that future medical expenses will be necessary and inevitable. The record also shows that Richard incurred past medical expenses of approximately $73,000.00. Richard also has a history of significant and unusual complications. Although the medical experts did not establish with certainty the extent of future surgery plaintiff may need, the evidence in the record is sufficient to find that the jury award of $200,000.00 is not an abuse of the trier of fact's much discretion.

E. Loss of Consortium
The jury in this case found that Tonya Richard did not suffer any loss of consortium and, accordingly, the trial court dismissed this claim. In reviewing awards for loss of consortium, or the lack thereof, appellate courts give much deference to the trier of fact's determination. Broussard v. Meaux, 94-313 (La.App. 3d Cir. 11/2/94), 649 So.2d 661, 669. The trier of fact's determination is a factual finding, and the reviewing court will not set it aside in the absence of manifest error.
Plaintiffs had been married four years at the time of Richard's accident. Mrs. Richard had recently completed training as a nursing assistant but was required to quit work to care for her husband. She spent every night on a cot at his bedside during Richard's nineteen-day hospital stay. During that time she assisted Richard in many ways, including performing the duties of nurses and nursing assistants when they were unavailable. She stayed with her brother-in-law in Baton Rouge at night when her husband was in rehabilitation there, spending every day with him from 7:00 a.m. to 9:00 p.m. She has been primarily and almost solely responsible for assisting him at home.
Both plaintiffs testified that their social and sexual life together has suffered since the accident. Although neither explained this fact in great detail, both stated their sexual relations were normal before the accident and have not been very good since.
Mrs. Richard also testified that having her husband at home all day every day has also placed a strain on their relationship.
*1094 Mrs. Richard testified Richard was arrested on two occasions for domestic disturbances. She explained that on one of these occasions, they had been arguing, and he would not let her in the house. She testified the police told her they would have to arrest her husband in order for her to get in. He was arrested, she spent one night with her mother, then the couple reconciled. Both of these incidents occurred prior to the accident. Tonya testified she and her husband had never been separated for more than one night because of marital discord.
We think the jury was clearly wrong in not awarding damages for loss of consortium. The record shows Mrs. Richard was devoted, attentive, and went to great lengths to assist her husband during his surgeries and recovery. The record also shows that their relationship has suffered under the strain and that Richard's past and permanent impairment significantly prevents him from being of much help at home.
Our de novo review of the record shows that Mrs. Richard should be awarded the sum of $25,000.00 to compensate her for her loss of consortium.

F. Conclusion
In summary, we amend the judgment to reapportion all (100%) fault to the defendants. We affirm the award of $125,000.00 in general damages and $200,000.00 in future medical expenses to Richard.[6] We reverse the judgment dismissing Mrs. Richard's claim and render judgment in her favor and against defendants in the sum of $25,000.00, together with legal interest thereon from date of judicial demand until paid. All costs of this appeal are assessed to defendants.
AMENDED IN PART, AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Turner intervened for reimbursement of worker's compensation, which was granted by the judgment. Turner did not appeal, and no issues were raised by the other parties concerning Turner's intervention.
[2] We note that the "test" to which plaintiff refers is not set forth in Edmonson. Rather, Edmonson holds that the Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), analysis is applied in civil litigation as well as criminal.
[3] The court minutes state that Annette Butler was sworn in as a juror. However, the transcript indicates and the parties do not dispute that Butler was released by defendants' peremptory challenge. The transcript of the voir dire indicates that juror Brenda Bunch, who was in the first venire, was never excused. Therefore, we assume for purposes of this appeal the minutes were incorrect and the juror who was sworn was Brenda Bunch.
[4] In brief, defendants contend the trial court did not find plaintiffs had made a prima facie showing of discrimination when the objection was made to defendants' use of the second three peremptory challenges on blacks. The total number of peremptory challenges defendants were allowed was six. At the time the second objection was made, defendants had used all their challenges, and all were used to exclude blacks.

On its face this is sufficient to make a prima facie showing. Furthermore, without objection and without waiting for a specific finding that a prima facie case was shown, defendants offered explanations why each peremptory challenge was used.
[5] We pretermit discussion regarding plaintiffs' contention that the trial court should have granted a directed verdict on the issue of Richard's contributory negligence because of this finding.
[6] Defendants expressly abandoned their assignment of error regarding the damage award for loss of earnings and earning capacity; therefore, we did not address those elements of the damage award.