HANS J. LILJEBERG, Judge.
| ¡¿Plaintiffs, Theodore and Lynell Schex-nayder, appeal a judgment rendered in accordance with a jury verdict in favor of defendants, dismissing plaintiffs’ claims against them. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

This case arises from a motor vehicle accident that occurred on September 18, 2007, on Louisiana Highway 18, commonly known as “River Road,” in St. Charles Parish.[1] Theodore Schexnayder was operating a 2007 Kawasaki motorcycle in a westbound direction. At the same time, two bucket trucks, which were owned by BellSouth Telecommunications, Inc. (“Bell-South”) and operated by Willard Smith and Gerard Zeringue, were traveling in an eastbound direction on River Road. As the vehicles approached or entered a sharp curve in the roadway, Mr. Schexnayder’s motorcycle collided first with the bucket truck operated by Mr. Smith and then with the bucket truck operated by Mr. Zeringue. As a result, Mr. Schexnayder suffered severe and debilitating injuries, and he is permanently quadriplegic.
Mr. Schexnayder and his wife, Lynell Schexnayder, filed suit against several defendants, including Mr. Smith, Mr. Ze-ringue, BellSouth, their insurer, and the State of Louisiana, through the Department of Transportation and Development (“the State”), asserting that these defendants are liable for the damages suffered by the Schexnayders. In their petition, plaintiffs assert that the collisions occurred when each of the BellSouth bucket trucks veered and crossed over the center line 14in the roadway, striking the motorcycle driven by Mr. Schexnayder. They allege that the negligence of both Mr. Smith and Mr. Zeringue caused these collisions and the resulting damages. Plaintiffs contend that BellSouth is liable as the employer of Mr. Smith and Mr. Zeringue, who were in the course and scope of their employment at the time of the collisions. Plaintiffs contend that the State is liable as the owner and custodian of the roadway, because the roadway contained defects that caused or contributed to the collisions in this case.
Defendants answered the lawsuit, generally denying the allegations of plaintiffs’ petition and asserting that the accident was caused solely by the negligence of Mr. Schexnayder. They claim that it was Mr. Schexnayder who failed to maintain his motorcycle in his lane of travel and veered across the center line, striking each of the BellSouth trucks and causing the resulting damages.
After pre-trial motions, including numerous motions in limine, were filed and heard, the matter came before the court for a jury trial on October 8, 2011. The trial concluded on October 7, 2011, and the jury returned a verdict in favor of defendants, finding that plaintiffs did not prove by a preponderance of the evidence that Mr. Smith, Mr. Zeringue, BellSouth, or the State was negligent. On October 18, 2011, the trial judge signed a judgment in accordance with the jury’s verdict, dismissing plaintiffs’ claims against all defendants with prejudice.[2] Plaintiffs appeal this judgment.

LAW AND DISCUSSION

On appeal, plaintiffs set forth four assignments of error by the trial judge and/or jury. In their first assignment of *502 error, plaintiffs assert that the trial judge erred by denying their Batson[3] objection, because defendants, with discriminatory intent, systematically struck all three African-American potential jurors — |Char-maine6 Williams, Earl Smith, and Sandra Woods — from the jury and failed to provide race-neutral reasons for these peremptory challenges. The record reflects that plaintiffs, Theodore and Lynell Schex-nayder, are African-American.
Defendants respond that plaintiffs did not carry their burden of showing purposeful discrimination, as required under a Batson analysis. They further assert that defendants would have had no plausible reason to exercise their peremptory challenges on the basis of race since one of the principal defendants, Willard Smith, is African-American. Finally, defendants contend that plaintiffs did not document the racial make-up of the entire jury venire, so there is no way to determine how many African-American potential jurors were in the venire. They note that the record reflects that Diana Oubre, an African-American, was excused from the jury for cause, so there were clearly more than three African-American potential jurors.
Equal protection prohibits the peremptory challenge of a prospective juror on the basis of race in both civil and criminal matters. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Ed-monson v. Leesville Concrete Co., Inc., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). A civil litigant may raise the equal protection claim of a person whom the opposing party has excluded from jury service on the basis of race. Edmonson, 500 U.S. at 629-31, 111 S.Ct. at 2088; Richard v. St. Paul Fire and Marine Ins. Co., 94-2112 (La.App. 1 Cir. 6/23/95), 657 So.2d 1087, 1089; Smith v. Lincoln General Hospital, 27,133, p. 22 (La.App. 2 Cir.
6/21/95), 658 So.2d 256, 271, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3. The approach set forth in Batson v. Kentucky, supra, whereby race-neutral explanations for peremptory challenges are required, after a prima facie showing of racial discrimination in the use of such challenges is established, is also applicable to civil cases. Edmonson, supra. >
li/To raise a Batson/Ed,monson challenge, the challenging party must first make a prima facie showing that the opposing party exercised a peremptory challenge on the basis of race. Batson, supra; Edmonson, supra. If a prima facie showing is made, the burden then shifts to the opposing party to articulate a race-neutral explanation for striking the jurors in question, which is related to the case to be tried. Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-1724. This second step of the process does not demand an explanation that is persuasive, or even plausible. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); Lester v. Exxon Mobil Corp., 10-743 (La. App. 5 Cir. 5/31/12), 102 So.3d 148, 161, writ denied, 12-2202 (La.4/19/13), 111 So.3d 1028. Unless a discriminatory intent is inherent in the striking party’s explanation, the reason offered will be deemed race-neutral. Hernandez v. New York, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991); Purkett, 514 U.S. at 768,115 S.Ct. at 1771.
In the third and final step of the analysis, the trial court must determine whether the party raising the Batson/Edmonson challenge has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 98, 106 S.Ct. 1723. At this stage, the trial court must consider the persuasiveness of the explanations. Purkett, 514 U.S. at 768,115 S.Ct. at 1771.
*503 In the present case, after the second panel of prospective jurors was questioned, plaintiffs’ counsel made a Batson/Edmon-son objection after defendants used a peremptory strike to excuse Kenton Robins.[4] In response to plaintiffs’ Batson/Edmon-son objection, the trial court indicated that defendants would have to |7provide their reasons for the peremptory strikes of each of the African-American potential jurors.[5]
The first African-American at issue that was excluded from the jury via a peremptory challenge by the defense was Charmaine Williams. Defense counsel indicated that a peremptory challenge was used to strike Ms. Williams from the jury because he did not like the comments she made in response to plaintiff counsel’s question regarding “casting defendants in judgment makes the community safer.” It was also noted by defense co-counsel that Ms. Williams indicated that she is a teacher for students with special needs and a substitute teacher would be needed if she were selected to be on the jury.
During voir dire, Ms. Williams indicated that she works with students with special needs. Later, plaintiffs’ counsel asked the prospective jurors if any of them had heard of jury verdicts that have helped to make the community safer, and counsel stated that there have been some really good jury verdicts that have helped with community safety, such as the “Ford rollover cases.” When asked about her feelings about those types of case, Ms. Williams stated, “I think it’s a positive thing.” She also stated that “it’s making the community safer.”
The second African-American at issue that was excluded from the jury on a peremptory challenge by defendants was Earl Smith. Defense counsel indicated that a peremptory challenge was used to strike Mr. Smith due to his comments on the “Brown’s Velvet curve.”[6] Defense co-counsel also noted that Mr. Smith “had all kinds of opinions about the River Road, going up the levee and all that stuff.”
|sDuring voir dire, Mr. Smith indicated that he works for the Lafourche Basin Levee District and is familiar with Louisiana Highway 18, known as River Road. Mr. Smith stated that he drives on River Road every day in both directions, sometimes four or five times a day, and that he travels the area of the “crooked curve” where the accidents occurred in this case. Mr. Smith stated that he hates to drive on River Road, and he repeatedly indicated that he does not like the curve where the *504 collisions occurred. He also stated that he has not personally had any problem with the area of the curve where the accidents occurred, because he drives up on the levee to avoid it, which is legal for him due to his employment with the Levee District.
Finally, the third African-American at issue that was excused by defendants via a peremptory challenge was Sandra Woods. Defense counsel stated that Ms. Woods was excused because she indicated that there are safety meetings once a week where she works, and that safety training for the BellSouth truck drivers was at issue because safety training was only provided “like once every six months.” Defense co-counsel also noted that Ms. Woods was a nursing student at Delgado and would have to miss a test if she were selected to be on the jury.[7]
During voir dire, Ms. Woods testified that she works at Ochsner Hospital as a patient care technician, and she was also enrolled in classes at Delgado Community College where she was taking her last prerequisite class for the nursing program. When the issue of safety training was discussed, Ms. Woods stated that she believes safety training should be provided for company drivers and that she has to have basic safety training every year where she works.
laAfter defense counsel provided reasons for them peremptory challenges of the African-American potential jurors, the trial court indicated that he accepted the reasons provided by defense counsel for their challenges and that the Batson/Edmonson objection was, therefore, denied. The trial court also noted that at the time of plaintiffs’ Batson/Edmonson objection, defendants had used peremptory challenges to strike three African-Americans and four whites from the jury.
The trial court’s conclusion on the ultimate question of discriminatory intent, which is a question of fact resting largely on a credibility determination, is accorded great deference on appeal. Batson, supra; Matthews v. Arida Lubricants, Inc., 32,-121, p. 19 (La.App. 2 Cir. 8/18/99), 740 So.2d 787, 800. A reviewing court should not reverse the trial court’s evaluations of discriminatory intent unless they are clearly erroneous. Lester, 10-743 at 17, 102 So.3d at 162.
Our review of the voir dire transcript reveals that defendants provided plausible race-neutral reasons for using their peremptory challenges to strike the prospective jurors at issue, and the trial court did not err by finding that plaintiffs failed to carry their burden of proving purposeful discrimination. Accordingly, this assignment of error is without merit.
In their second assignment of error, plaintiffs argue that the trial court erred by denying the jury’s request to visit the accident site or, alternatively, by not allowing the jury to view a videotape of the accident site. Defendants respond that the trial court correctly denied plaintiffs’ requests, because allowing the jury to go to the accident site or to view the videotape would have been tantamount to reopening the case for the presentation of additional evidence, and plaintiffs did not properly move to have the case re-opened.
| ¶ nWhile the jury was in deliberations, the trial court informed counsel for all of the parties that he had received a note from the jury asking if they could go to the accident site. The trial court denied the request, noting that there was no request *505 to visit the site during the trial and that “the evidence is in.” At that point, plaintiffs’ counsel requested that the trial court reconsider its pre-trial ruling on a motion in limine which prohibited plaintiffs from showing the jury a “traffic watch video” that showed traffic navigating the curve where the accident took place. The trial court denied this request as well.
The trial court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done. LSA-C.C.P. art. 1681. The trial court has great discretion in controlling the presentation of evidence. Kim v. Kim, 07-318, p. 9 (La.App. 5 Cir. 10/30/07), 970 So.2d 1158,1163.
In the present case, after all of the evidence was presented, closing arguments were made, the jury charges were read, and the deliberations began, the jury requested that they be allowed to visit the accident site. The trial court denied the request, noting that all of the evidence had been submitted. No request had been made during the trial for the jury to visit the accident scene. Further, we note that the exact location of the collisions was in dispute at trial, and a visit to the site would not have resolved the dispute. We find no abuse of the trial court’s discretion in refusing to re-open the case in order to allow the jury to visit the accident site or to view a video of vehicles navigating the curve in the area where the accident occurred.[8] This assignment of error is without merit.
|nIn their third assignment of error, plaintiffs contend that the jury erred by not assessing BellSouth with liability when the physical debris evidence proved that the two BellSouth vehicles crossed the center line and struck Mr. Schexnayder’s motorcycle. Plaintiffs acknowledge that the record contains completely different versions of how the accident occurred, namely, who crossed the center line, but they claim that the debris evidence and the testimony of their expert, Andrew McPhate, overwhelmingly supports plaintiffs’ version of events and negates defendants’ version.
Defendants respond that the eyewitness testimony of Mr. Smith and Mr. Zeringue, as well as the expert testimony of Dr. Michael James, clearly support the jury’s finding that BellSouth and its drivers did not cause the accident, but rather, the accident was caused by Mr. Schexnayder’s negligence.
At trial, Willard Smith testified that he worked for BellSouth for 32 years and he drove a bucket truck for 25 of those years. On September 18, 2007, Mr. Smith left a job site and proceeded on Louisiana Highway 18 on his way back to the work yard, with his co-worker, Gerard Zeringue, following behind him. Mr. Smith was familiar with the roadway and was driving his regularly-assigned bucket truck. At ap *506 proximately 4:20 p.m., as he came to a sharp curve in the road, he saw a motorcycle driven by Mr. Schexnayder traveling close to the center of the roadway, not in the middle of Mr. Schexnayder’s lane of travel. Mr. Smith testified that Mr. Schexnayder was driving upright, not leaning as if he was going to negotiate a curve or turn right in the curve. Mr. Smith stated that he was concerned that the motorcycle would hit his truck, so he pulled toward a driveway on the right and “halfway on the shoulder,” in order to avoid a collision.
|12Mr. Smith testified that he did not feel any impact when the motorcycle passed, but he noticed that Mr. Schexnayder was very close to his truck and there was a mark on the truck after the accident. Mr. Smith testified that he looked into his rearview mirror as Mr. Schexnayder passed, and he saw the motorcycle run into the side of Mr. Zeringue’s bucket truck. Mr. Smith testified that he did everything he could to avoid the accident. He was certain that his vehicle did not cross the center line and it was completely in his lane of travel, if not halfway on the shoulder, when the collision occurred.
Gerard Zeringue testified that he started working for BellSouth in 2004 and he is an outside plant technician, which requires him to drive a bucket truck. On the day of the accident, he pulled onto Louisiana Highway 18 behind Mr. Smith’s truck and was heading back to the work yard. Mr. Zeringue testified that he was familiar with this area of the roadway and its curves, as he had traveled on this road many times before. When he approached a curve in the road, he saw a motorcycle coming out of another curve and heading toward them. He saw that the motorcycle was not leaning and was “straight up,” as if the driver had no intention of turning. Mr. Zeringue testified that he saw Mr. Smith trying to move his truck toward the side of the road, and he tried to move his truck over as far as he could as well. Mr. Zeringue saw the motorcycle “skim” Mr. Smith’s truck. Then, the motorcycle struck the side of Mr. Zeringue’s truck. Mr. Zeringue testified that he was certain that his truck did not cross the center line and was within his lane of travel or further to the right shoulder at the time of the collision.
Theodore Schexnayder testified that he does not recall the motorcycle accidents at all. However, based largely on the testimony of their expert, Andrew McPhate, plaintiffs claim that the collision occurred in Mr. Schexnayder’s lane of | ^travel, when the BellSouth bucket trucks crossed the center line and struck Mr. Schexnay-der on his motorcycle.
At trial, Andrew McPhate was accepted as an expert in mechanical engineering, vehicle dynamics, and accident reconstruction. Mr. McPhate testified that the photographs of the accident do not reveal any tire or skid marks, but he believes the “debris field” reveals that the accident occurred in Mr. Schexnayder’s lane of travel. He testified that “all kinds of debris” would be expected in the BellSouth drivers’ lane if they had pulled their vehicles toward the side of the road. He admitted that Mr. Schexnayder would have been traveling near or relatively close to the center line, but maintained his opinion that the accident occurred in Mr. Schexnay-der’s lane of travel. Mr. McPhate acknowledged that there is a dispute as to the exact location where the collision occurred, and that the physical evidence does not establish with certainty where the accident occurred. Mr. McPhate testified that his estimate of where the accident occurred is based on the debris field, as shown in the photographs taken after the accident.
*507 Defendants called Dr. Michael James, who was accepted as an expert in accident reconstruction and human factors as they relate to accident reconstruction. Based on the work he performed in this case, along with his education and experience in crash testing, Dr. James testified that he believes very strongly that the accident occurred in the truck drivers’ lane of travel. He also found that more likely than not, the motorcycle was upright when it struck both of the BellSouth trucks. Dr. James disagreed with Mr. McPhate’s opinion that the debris field showed the accident occurred in Mr. Schexnayder’s lane of travel. He testified that someone cannot look at debris in the road and say where an accident occurred, without considering the path and trajectory of the motorcycle.
114Lynell Schexnayder testified that Mr. Schexnayder bought his motorcycle in August of 2007, which was shortly before the September 18, 2007, incident. Although she was aware that Mr, Schexnayder had driven a motorcycle many years ago in high school, she admitted that between the time he purchased this motorcycle and the time of the accident, he had taken the test for a motorcycle endorsement on his driver’s license two times and had failed the test both times.
A court of appeal may not set aside a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact-finder’s determinations, the appellate court must find that: 1) a reasonable factual basis for the finding does not exist in the record; and 2) the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, through Dept, of Transp. and Development, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether its conclusion was a reasonable one. Id.; LeBlanc v. Baxter, 05-33, p. 18 (La.App. 5 Cir. 5/31/05), 905 So.2d 415, 426, writ denied, 05-1742 (La.1/13/06), 920 So.2d 239.
Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, llll(La.l990); Billiot v. Estate of Richardson, 94-1794 (LaApp. 1 Cir. 5/5/95), 655 So.2d 443, 446, writ denied, 95-1400 (La.9/15/95), 660 So.2d 453. Factual findings that are based on determinations regarding the credibility of witnesses must be afforded great deference. Ber-geron v. Williams, 05-847 (LaApp. 1 Cir. 5/12/06), 933 So.2d 803, 807. Even if an appellate court may feel that its own evaluations and .inferences are more reasonable than the factfinder’s, reasonable evaluations of fact should not be disturbed upon review where conflict exists in the testimony. Id.; h^Rosell, 549 So.2d at 844. Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882; Laborde v. Roser’s Cleaners, L.L.C., 07-78, p. 4 (LaApp. 5 Cir. 5/15/07), 957 So.2d 865, 867, unit denied, 07-1474 (La.10/5/07), 964 So.2d 945.
In the present case, both Bell-South drivers testified that Mr. Schexnay-der was driving his motorcycle and veered across the center line into their lane, striking the BellSouth bucket trucks. Mr. Schexnayder suffered severe injuries in the accidents and does not remember the details of the collisions at all. Plaintiffs’ expert in accident reconstruction, Mr. McPhate, opined that, based on the debris field depicted in the photographs taken after the accident, the accident most likely occurred in Mr. Schexnayder’s lane of *508 travel. However, defendants’ expert in accident reconstruction, Dr. James, testified that based on the evidence, the accident most likely occurred in the BellSouth drivers’ lane of travel. He further testified that he does not believe that someone cannot look at debris in the road and say where an accident occurred, without considering the path and trajectory of the motorcycle.
The jury was presented with all of the evidence, including the testimony of the parties’ experts, and apparently found the testimony of the defense witnesses and their expert, Dr. James, to be more credible. Considering the evidence before us, along with the applicable law, we can find no manifest error in the jury’s determination that BellSouth, Mr. Smith, and Mr. Zeringue were not negligent and did not cause the accident and resulting damages in this case. Accordingly, this assignment of error is without merit.
In their fourth and final assignment of error, plaintiffs argue that the jury erred by not assessing the State with liability when the evidence demonstrated that |1fithe State failed to maintain the center or yellow line of the roadway. They argue that while the experts for plaintiffs and defendants opined that the physical highway contained no structural design defects, the absence of a middle dividing line or yellow lines created an unreasonable risk of harm and clearly contributed to the accident.
The State responds that the sole cause of the accident was Mr. Schexnayder’s failure to follow the curve in the road. They note that Mr. Smith and Mr. Zeringue both testified that they had no trouble determining where they were on the two-lane roadway at all times, despite the fact that a portion of the yellow center stripe was worn. They argue that while the yellow center line was worn for approximately 100 feet, this was only at the apex of the curve, not on the rest of the curve. Thus, they contend that it could not have played any part in this incident.
All of the drivers involved in this incident were familiar with the roadway and its curves. Willard Smith and Gerard Ze-ringue both testified that they had traveled this roadway before and were familiar with it. Lynell Schexnayder testified that Mr. Schexnayder lived near this roadway “pretty much” all of his life.
It is undisputed that there are portions of the roadway on which the center line was worn due to vehicles driving over it as they negotiated the curve in the road. Plaintiffs’ expert, Mr. McPhate, testified that there is about 100 feet of the yellow line missing in the area of the accident, but he admitted that Mr. Schexnayder would have had a yellow stripe on the roadway almost to the point of impact. He did not believe that the absence of the yellow line in some places confused any of the drivers involved in this incident. Rather, he testified that he believed they knew exactly where the center line was or would have been.
117WiIlard Smith testified that he did not have any trouble figuring out which side of the road was his. He stated that the center stripes are sometimes missing, but not for long distances. He testified that the center stripes may be missing for “[m]aybe like eight or ten feet and then it’ll be striped again.”
Gerard Zeringue testified that when he drives on the curve near the accident site, he slows down and makes sure that he stays in his lane in order to negotiate this curve. He also acknowledged that there are areas in the roadway where the yellow stripe is worn, but this did not cause him any problems and he was not confused as *509 to what half of the road he was to be traveling in.
The jury was presented with all of the evidence and found that the State was not negligent. Clearly, the jury did not believe that the condition of the State-owned roadway caused or contributed to the accident in this case. Considering all of the testimony and evidence in the record before us, we find no manifest error in the jury’s determination, and this assignment of error is without merit.

DECREE

For the foregoing reasons, we affirm the trial court’s judgment rendered in accordance with the jury’s verdict in favor of defendants, dismissing plaintiffs’ claims against them with prejudice.

AFFIRMED.

. Louisiana Highway 18 is a two-lane roadway with one lane of traffic in each direction, and it has many twists and curves as it follows alongside the Mississippi River.

. Plaintiffs filed a motion for new trial, which was denied by the trial judge on November 9, 2011.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. It is noted that plaintiffs do not argue on appeal that the trial court erred in allowing defendants to use a peremptory strike to excuse Mr. Robins from the jury. Because plaintiffs made their Batson/Edmonson objection on the basis of race immediately after defendants used a peremptory challenge to excuse Mr. Robins, it is presumed that Mr. Robins is African-American. Thus, as asserted by defendants, the jury venire apparently consisted of more than three potential African-American jurors, though the racial makeup of the entire venire is not clear from the record.

. Because defendants offered reasons for their peremptory challenges, the issue of whether plaintiffs made a prima facie showing of racial discrimination is moot and need not be addressed. See State v. Nelson, 10-1724, p. 11 (La.3/13/12), 85 So.3d 21, 29; Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991); State v. Jacobs, 99-991, p. 8 (La.5/15/01), 803 So.2d 933, 941, cert, denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002).

.It was noted during voir dire that the “Brown's Velvet curve” is on the east bank, whereas the accident in this case occurred on the westbank. However, Mr. Smith indicated that he was familiar with “River Road” on the westbank, as well as the eastbank, and he specifically stated that he was familiar with the area where the accident occurred.

. Defense counsel had initially challenged Ms. Woods for cause because she was a nursing student who would miss a test if chosen to be on the jury. The trial judge denied this challenge, stating that she would probably be allowed to make up the test.

. Even if a request to visit the accident site had been made before the close of evidence, we note that generally, a trial judge has the authority to allow a visit to a site that is the subject of the litigation only in instances where the testimony is so confusing or conflicting that such an excursion would aid the factfinder in visualizing the disputed occurrence. See Bico Enterprises, Inc. v. Cantrell, 413 So.2d 260, 264 (La.App. 3 Cir. 1982). In the present case, the evidence did not appear to be confusing, and the conflicting testimony as to whether Mr. Schexnayder or the Bell-South drivers crossed the center line could not be resolved by viewing the accident site. We further note that the trial court excluded the "traffic watch’’ video from evidence when it granted defendants’ motion in limine on this issue, and plaintiffs did not show that this decision was incorrect or should be reconsidered at this stage of the proceedings.